## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **MICHAEL PEASTER** <br><br> **Plaintiff,** <br> **vs.** <br><br> **McDONALD'S CORPORATION, a Delaware corporation, and CHRISTOPHER KEMPCZINSKI** <br><br> **Defendants.** | **Case No. _____** <br><br><br> **Jury Trial Demanded** |

## COMPLAINT FOR DEPRIVATIONS OF CIVIL RIGHTS

Plaintiff, Michael Peaster, by his attorneys, Carmen D. Caruso and William B. Whitner, brings suit under the Civil Rights Act of 1870 (42 U.S.C. § 1981) against Defendants McDonald's Corporation ("McDonald's" or the "Company") and Christopher Kempczinski ("Kempczinski") to redress intentional race discrimination, disparate treatment, hostile work environment, and unlawful retaliation.

## PARTIES

1.  Plaintiff Michael Peaster is an African American citizen and resident of the State of Illinois residing in Naperville.

2.  Defendant McDonald's Corporation is a publicly traded Delaware corporation that manages (through subsidiaries) the world-wide McDonald's restaurant system that includes both franchised and company-owned McDonald's

1

restaurants. McDonald's has its principal place of business in Chicago, Illinois, at 110 North Carpenter Street.

3. Defendant Christopher Kempczinski ("Kempczinski"), a White person, is the president and CEO of McDonald's. From 2016 to in or about November of 2019, he had been the president of McDonald's USA, LLC, the subsidiary responsible for managing the McDonald's restaurant system in the United States. On information and belief, Kempczinski resides in Chicago, Illinois and works at McDonald's headquarters in Chicago.

4. McDonald's acts through its officers, directors, and employees. All acts and omissions by McDonald's officers and management employees were done in McDonald's business and are imputed to McDonald's under *respondeat superior*.

## JURISDICTION AND VENUE

5. Plaintiff brings federal claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1988; and asserts pendent jurisdiction over the state law claim arising from the same facts.

6. Venue is proper under 28 U.S.C. § 1391 because the Defendants reside in this District and the unlawful conduct occurred or was orchestrated at McDonald's headquarters within this District.

## FACTS

7. Michael Peaster is a 35 year veteran employee of McDonald's, who worked in corporate safety, security, and intelligence. For more than 10 years, Michael Peaster had been in charge of the Company's corporate safety, security, and

2

intelligence department.  He was responsible for protecting the Company's assets including its people, physical assets, and brand. He supervised a team of safety, security, and intelligence professionals who reported to him.

8.     On January 1, 2022, Michael Peaster was re-promoted to "Officer" status at the Company and his title was Vice-President of Global Safety, Security, and Intelligence.  His Global Safety, Security, and Intelligence department was part of the Company's Global Legal group that reported to McDonald's Corporation's General Counsel, Desiree Ralls-Morrison ("Ralls-Morrison").

9.     Being an Officer is at McDonald's is highly desirable as it positively impacts compensation, future opportunities, and stature within the Company. Peaster's re-promotion to the Officer level in 2022 was not a change in his duties. It was an affirmation by McDonald's that Peaster is a highly qualified and competent corporate security professional who deserved to be an Officer.

10.     In 2022, Peaster's direct supervisor was Malcom Hicks, who is also an attorney in McDonald's "Global Legal" Group.  However, Peaster worked directly with Ralls-Morrison, the general counsel, when it came to Peaster's responsibilities for the protection of Christopher Kempczinski, the Chief Executive Officer of McDonald's Corporation.

11.     On November 7, 2022, the Company's General Counsel, Ralls-Morrison, informed Peaster he is being terminated effective December 31, 2022.  Ralls-Morrison claimed that Peaster had performed poorly as Vice-President of Global Safety, Security, and Intelligence, but the accusation of poor performance was pretextual.

This termination was discriminatory against Michael Peaster because of his race; it was part of hostile work environment based on his race; and it was retaliatory against Michael Peaster based on his respectful but legitimate contradiction of Kempczinski on the subject of race.

### **Michael Peaster's Contradicts Kempczinski On Race**

12.     In the fall of 2021, Kempczinski became the subject of substantial public outrage after the media published certain text messages he had written to the Mayor of Chicago, Lori Lightfoot, following a tragic incident in which a child was shot as she sat in her car in the drive-through service lane of a McDonald's restaurant in Chicago. In his texts to the Mayor, Kempczinski blamed the child's parents for exposing her to violence.

13.     Confronted by a hostile media storm branding his text messages to the Mayor as racist, Kempczinski publicly admitted his texts were "wrong" and reflected his "very narrow worldview." Kempczinski, supported by McDonald's, publicly campaigned to rehabilitate his image.

14.     Kempczinski also convened an in-person meeting of McDonald's employees in the corporate headquarters to discuss his racist texts. Peaster attended. Kempczinski spoke, but Peaster believed Kempczinski was in denial as to *why* many people believed his texts were racist and were offended. When Kempczinski said he would answer questions, one employee asked Kempczinski, "What would you say to those who agreed with your comments?" Kempczinski responded, "I would say you would have to look at your values, and then make the right decision." Peaster thought

Kempczinski was being evasive, or worse. Peaster raised his hand, and, when called upon, he rebuked Kempczinski's response to the other employee's question by saying (in words or substance):

> To those employees who agreed with Christopher Kempczinski's comments, think about their fellow employees who are in the room who live in the neighborhoods being discussed. Think about the kids who are in their homes and playing on playgrounds who are killed by stray bullets. We cannot broad brush the violence issues in Chicago to make it appear that all parents who have children who are victims to gun violence are bad parents. We have to have empathy and compassion for the majority of families who live in tough communities that work hard to provide for their family and keep them safe.

15.     Peaster recalls that his words were greeted with applause. Peaster does not recall Kempczinski having any response to Peaster in the town hall.

16.     Peaster spoke these words at an open meeting of McDonald's employees after the Company invited its employees to speak out on the subject of race, as part of the Company's attempt to mitigate the harm that Kempczinski had caused with his racist texts. Peaster spoke truth to power and for this reason he was punished as alleged below.

## Kempczinski Humiliates Peaster By Ignoring Him

17.     Defendants did not immediately retaliate against Peaster with an adverse employment action for his response to Kempczinski. They were too clever to do that.

18.     Kempczinski never responded to Peaster's comments at the town hall, either publicly nor privately, but Kempczinski punished Peaster for publicly questioning his sincerity in purporting to apologize for his racist texts. After Peaster

5

spoke at the town hall, Kempczinski intentionally avoided Peaster even though, as of January 1, 2022, Peaster was an Officer of the Company and was *the* Officer responsible for Kempczonski's personal security.

19. For the McDonald's CEO to publicly ignore and ostracize *any* McDonald's Officer would humiliate and degrade the Officer because being an Officer is supposed to confer respect on the Officer within the Company, and obvious disrespect by the CEO would send an unmistakable message that the Officer is disfavored and has no future with the Company.

20. For Kempczinski to ostracize Peaster was even more humiliating and degrading since Peaster was in charge of Kempczinski's personal protection. Kempczinski's overt treatment of Peaster as an "Invisible Officer" was blatant disrespect inherently and intentionally humiliating to Peaster.

21. In treating the Officer charged with his personal security as the Invisible Officer, Kempczinsi was sending an unmistakable message that all Company employees, even Officers, were to remain silent on the subject of Kempczinski's racist texts. Peaster's voice as an African American on a vitally important social issue was intentionally stifled. This was inherently hostile to Peaster and a warning to all other employees and Officers, especially to any reasonable African Americans in Peaster's position. This hostile work environment began in early 2022 and continued through November 7, 2022, when Ralls-Morrison told Peaster he was fired for pretextual reasons.

22.    In the first few months of 2022, Peaster tried to ignore the intentional humiliation and hoped that the situation would improve.

### McDonald's Ignores Peaster's Advice On Corporate Security

23.    In the spring of 2022, the Company, through Ralls-Morrison, instructed Peaster to provide enhanced security for its executives, especially Kempczinski, who travelled extensively.

24.    In response, Peaster agreed that security should be enhanced, and he repeated requests he had made that his department needed a budget increase to hire additional security personnel to meet the request for enhanced security. The budget increase proposed by Peaster would have been an infinitesimal fraction of the Company's revenues and a fraction of the compensation that the Company's top executives receive each year.

25.    However, the Company, through Ralls-Morrison, rejected Peaster's request to hire more security personnel but did not explain how it expected Peaster to meet the request for enhanced security on the current budget. This contradicted Company protocol. The Company did not have to accept an Officer's budget recommendation, but, typically, there would be an Officer-level *conversation* preceding an important decision. In Peaster's case, there was no conversation. The General Counsel stated a request for enhanced security that Peaster agreed with, then refused to pay for it or even discuss Peaster's proposed business solution. By June 2022, the situation was becoming unbearable for Peaster but he continued to suffer in silence.

## Kempczinski Refuses To Meet With Peaster

26.     In June 2022, Peaster sought to meet with Kempczinski to discuss corporate security and convey his intention to immediately address and rectify any concerns Kempczinski had about Peaster or Peaster's department.

27.     As an Officer of the Company, Peaster's request to meet with Kempczinski should have been routinely granted. That is one perk of being an Officer.

28.     On or about June 21, 2022, Peaster informed Ralls-Morrison that he scheduled a meeting with Kempczinski to ensure his security needs were being met and to get feedback on any additional concerns Kempczinski may have had.  In response, Ralls-Morrison told Peaster that she doubted the meeting would occur, and she was correct.  Breaking protocol, Kempczinski refused to meet with Peaster even though a meeting had been scheduled before Kempczinski or his assistant cancelled it and then cancelled a second time after Peaster tried to reschedule. Neither Kempczinski nor his assistants gave Peaster an explanation as to why his attempt to meet with Kempczinski was cancelled twice nor did Kempczinski or his assistant propose an alternative time for Peaster to meet with Kempczinski.

29.     By June 2022, or earlier, the Company's top legal officer, Ralls-Morrison, knew that Kempczinski was refusing to meet with Peaster in derogation of established custom, practice, and protocol at the Officer level. She offered no explanations and no solutions. Peaster had been naïve in believing that Ralls-Morrison would help Peaster get a meeting with Kempczinski to discuss important Company business.

## Kempczinski Publicly Humiliates Peaster At An Officers Meeting

30.    On or about June 29, 2022, having been re-promoted to Vice President effective January 1, 2022, Peaster attended an Officers Meeting where Kempczinski was to welcome and congratulate the new Officers. Kempczinski did so. He recognized and congratulated all the newly promoted Officers except one: Michael Peaster. This omission was noticeable, and other persons present mentioned it to Peaster afterwards, which added to Peaster's humiliation.

31.    Kempczinski's continuing purposeful humiliation of Peaster through his conduct described above, and the lack of support from Ralls-Morrison caused Peaster to suffer severe anxiety and emotional distress that intensified as 2022 wore on.

## McDonald's Refuses To Allow Peaster To Fill Open Positions

32.    In the summer of 2022, the Company blocked Peaster from filling open positions in his department though his peers at the Vice-President level (without limitation, his Legal Office peers included Compliance, Litigation, Labor and Employment, and US General Council), who are White, were allowed to fill open positions in their departments. Peaster informed his boss, Malcom Hicks, of this disparity but to no avail.

33.    As the most serious example of paragraph 32, but without limitation, the Company (through Ralls-Morrison) forbade Peaster from filling the position of Director of Corporate Security, a position under Peaster in charge of security at Company meetings and events and responsible for the security of the Company Headquarters in Chicago, Illinois. The individual with this job, Dennis Quiles, retired

effective August 1, 2022. In the months before his retirement, Peaster sought permission to recruit his replacement, so the replacement could be onboarded and trained by Quiles before Quiles retired. The Company (through Ralls-Morrison) told Peaster he could not recruit a replacement for this important position, which oversaw the security for over fifty (50) Company meetings a year (for example, the McDonald's Worldwide Convention and Leadership Meetings).

34.     The Company gave Peaster no legitimate reason why he could not fill this important position. Again, this was a departure from usual practices as the Company routinely allows Officers to fill positions in their departments; and the Company did not explain why Peaster was being treated differently.

35.     Peaster and his team were forced to split up the work and responsibilities of the open Director of Corporate Security position, but Peaster reasonably feared that leaving this position open created needless risk for Company employees and business partners.

36.     Not allowing Peaster to fill the Director of Corporate Security position, on top of not allowing him to hire more security personnel, made it difficult for Peaster to maintain the existing level of security, let alone provide the enhanced security Ralls-Morrison had requested. The Company was systematically setting Peaster up to fail so it could blame and terminate him.

37.     Kempczinski made it even harder for Peaster to provide personal security by refusing to have Executive Protection Service ("EPS") agents near him or in the room with him as Peaster recommended. Peaster was told that Kempczinski

did not like the appearance of having security, but this too made it harder for Peaster to meet the Company's directives to Peaster to increase Kempczinski's security.

38.     By the end of July 2022, Peaster feared that Kempczinski, Ralls-Morrison, and the Company were setting him up and looking for a reason to fire him. Peaster continued to do his best under increasingly hostile circumstances. Peaster's emotional distress and suffering worsened.

### The Company's Lawyers Interview Peaster as a Possible Witness In Another Civil Rights Action Against McDonald's Based on Race

39.     On or about July 28, 2022, the Company arranged for Peaster to be interviewed by its lawyers who are defending another civil rights lawsuit brought against the Company under Section 1981 by other former African American executives. Peaster candidly answered each question posed by the Company's lawyers.

40.     After Peaster was interviewed as a possible witness in another civil rights case against these Defendants and after the Company's other acts and omissions in 2022 as alleged above, Ralls-Morrison and Kempczinski found an occasion to criticize Peaster's job performance.

### Ralls-Morrison Refuses To Allow Peaster To Fly With Kempczinski On The Company's Private Jet

41.     In the summer of 2022, Ralls-Morrison and Kempczinski planned a business trip to Mexico City, Mexico and São Paulo, Brazil.  This trip occurred from August 22 to August 25, 2022.

42.     In advance of the Mexico City/São Paulo trip, Peaster informed Ralls-Morrison that, as they had previously discussed, he would personally manage their

security on this trip. Peaster agreed that these destinations called for his personal involvement, and, in addition, he welcomed the opportunity to spend time with Kempczinski and Ralls-Morrison.

43.     McDonald's owns a 2017 Gulfstream Aerospace 6550 jet that its top executives use for their travel.

44.     As an Officer in the company, Peaster reasonably expected to travel on the corporate jet with Kempczinski and Ralls-Morrison on this trip. McDonald's established custom and practice is to allow its Officers to fly on the corporate jet.

45.     Furthermore, the Company would typically ask members of the executive security team to accompany its Officers on the corporate jet particularly during foreign travel. As a passengers on the company jet, executive security personnel can protect the Company's top executives as they board and deplane. Non-passengers cannot provide the same level of security.

46.     Contradicting the Company's established custom and practice and despite having personally asked Peaster to accompany her and Kempczinski to Mexico City and São Paulo, Ralls-Morrison ignored Peaster when he sought to confirm that he would fly on the corporate jet with her and Kempczinski. Peaster instead was relegated to fly commercial and met his security clients, including Ralls-Morrison and Kempczinski, in the destination cities, first Mexico City, then São Paulo. Consequently, Peaster could not personally ensure their safety as they departed and arrived on each leg of the trip.

47. There was no valid business reason to exclude Peaster, a corporate Officer and the person in charge of protecting Kempczinski and Ralls-Morrison, from flying with his security clients on the corporate jet.

48. On information and belief, the order to exclude Peaster came from Kempczinski, or it reflected Ralls-Morrison's desire to keep Peaster away from Kempczinski because she knew that Kempczinski did not want Peaster to be on the same plane as him. Excluding Peaster, a Company Officer, from the Company's jet was an unmistakable insult stemming from Kempczinski's animus to Peaster after Peaster's statement at the town hall meeting on race in late 2021.

49. Making things worse, when they reached São Paulo, Ralls-Morrison criticized Peaster for inconveniences that would have been avoided had Peaster been allowed to fly with his security clients on the Company jet.

50. After the Mexico City / São Paulo trip, Ralls-Morrison unfairly criticized Peaster, claiming that she and Kempczinski had felt unsafe in these cities, and alleging that it was Peaster's fault. These criticisms were without merit. Despite the inconveniences that resulted from Peaster having to fly commercial, Peaster and a subordinate provided adequate security on this trip.

51. Moreover, Peaster could have provided an additional security team member, but the Company had refused his budgeting requests that would have made this possible.

52. Ralls-Morrison's false accusation that Peaster put Kempczinski and Ralls-Morrison at risk (after refusing to discuss; let alone implement, his

13

recommedations for their protection) caused Peaster to suffer more anxiety and more emotional distress.

### Peaster Tries To Address Kempczinski's Publicly-Stated Fears That Chicago Was In Crisis Over Crime

53.     In September 2022, Kempczinski publicly complained that crime was "seeping into every corner" of Chicago in ways that he clained were impacting the Company's restaurants and making it harder to recruit corporate talent to work at the Company's headquarters on Carpenter Street.

54.     In response to media coverage over Kempczinski's fear of crime, Peaster reminded Ralls-Morrison he had been asking the Company to modestly increase its spending on security and to allow him to fill open security positions. However, Ralls-Morrison brushed Peaster off by telling him that his request(s) could be reviewed as part of budgeting for the next year.

55.     The General Counsel's response contradicted Kempczinski's public declarations of fear.

56.     Knowing that his CEO believed the Company was being adversely affected by crime in Chicago but having the General Counsel reject his proposals that were intended to enhance safety, without discussion, added to Peaster's humiliation and stress.

### Defendants' Misplaced Criticism Of Peaster After Labor Union Advocates Approach Him In New York

57.     Peaster was informed that, following a meeting at The Pierre hotel in New York City on or about October 26, 2022, Kempczinski complained that executive

protection had been inadequate after labor union advocates entered a ballroom while Kempczinski was present.

58.     To Peaster's knowledge, information, and belief, the labor union advocates wanted Kempczinski to hear their message they were expressing on behalf of the workers in McDonald's restaurants.  Peaster was not informed of any actual or threat of violence to Kempczinski on this occasion.

59.     Ralls-Morrison criticized Peaster and blamed him for alleged indadequate security in New York. Peaster responded, truthfully, that this was further proof the Company needed to increase the security budget and allow him to fill open positions in his department; and that Kempczinski should accept the executive protection services Peaster had been recommending.

## Peaster Asks To Meet With Ralls-Morrison

60.     In their conversation about the New York trip, Peaster told Ralls-Morrison that they needed to align on Kempczinski's protection, but Ralls-Morrison refused to have the conversation or provide confirmation that Kempczinski would be receptive to executive protection services as recommended by the EPS Team led by Peaster.

61.     By the end of October 2022, Peaster could no longer bear the anxiety and emotional distress being inflicted upon him.  He genuinely feared for the safety of Company executives and employees and believed the Company must increase its security budget or expose the Company to unnecessary safety and security risks.  It appeared to Peaster that this was a price Kempczinski was willing to pay to get rid of him.

62.     At the end of October 2022, Peaster told Ralls-Morrison that he had reached the limits of the stress, sleepless nights, and overall anxiety and suffering he had endured in worrying not only for himself but for his Executive Protection staff and *everyone* at the Company he had sworn to protect.

63.     Ralls-Morrison agreed to meet with Peaster on November 7, 2022. Peaster attended this online meeting via WebEx. He was greeted by Ralls-Morrison and a representative of the Company's HR department. Ralls-Morrison informed him that he was terminated effective December 31, 2022 because she had allegedly lost confidence in his ability to protect the CEO. She then left the online meeting. The HR representative stayed on to explain the Company's severance offer, which the Company then put in writing.

64.     The Company's written severance offer was notable for its threat to retaliate against Peaster if he refused to agree not to sue the Company and not to remain silent about the Company's conduct. The Company acknowledged that Peaster had already earned the right to acquire valuable stock in the Company based on his years of loyal service, which the Company calculates based on an established protocol it calls the "Rule of 68" – but only if the departing employee agreed to remain silent and not to sue. If an employee asserts a violation of his or her civil rights, the Company retaliates by withholding a benefit that was previously earned.

65.     The Company terminated Peaster based on phony criticisms that did not begin until after Peaster spoke out on race at the town hall meeting, after Kempczinski made it clear that he refused to have any personal relationship with

Peaster, after the Company repeatedly rejected Peaster's proposals for enhanced security without stating business reasons or proposing alternatives, and after the Company's lawyers interviewed Peaster in connection with another civil rights case.

66.    In Peaster's thirty-five (35) years of employment with McDonald's, Peaster was never rated below a "Significant Performer." Peaster has never been on a performance improvement plan nor has he ever been written up for performance issues or performance concerns. Peaster has received numerous awards and recognition throughout his career, including the President Award. In addition, because of his consistent performance, Peaster was the National Executive Sponsor of the Working Parents, Young Professionals, and Veteran Employee Networks. Despite his accomplishments, all it took was one truthful statement in a Town Hall meeting that Kempczinski did not consider racially supportive of him to unravel and destroy Peaster's reputation and career at the Company.

67.    Further evidence contradicting the Company's stated reasons for terminating Peaster (that Ralls-Morrison had lost confidence in Peaster's ability to protect Kempczinski or other executives), includes, without limitation:

      a. Following Peaster's reinstatement as a Vice President in January 2022, Peaster reported to corporate counsel Mahrukh Hussain and then to corporate counsel Malcom Hicks after Hussain's departure from the company in or about April 2022. On information and belief, Malcom Hicks was not consulted about or informed about the

17

decision to terminate Peaster, which would have been normal protocol.

b. Peaster and his team supported Kempczinski on over fifty (50) trips and events in 2022. Of the fifty trips, Ralls-Morrison only criticized Peaster and his team's handling of two trips: the event in New York and the trip to Mexico City & São Paulo. Ralls-Morrison's criticisms of Peaster's and his team's performance on these two trips was unjustified, and, on information and belief, Ralls-Morrison had complimented Peaster's EPS team for their work after every Board of Directors meeting; and

c. Despite being understaffed, there has been no physical harm done or significant safety threats made to executives since Peaster has led the Executive Protection Program. The Executive Protection Team, under Peaster's leadership, mitigated many potential threats through their diligence and hard work.

## **Injury**

68.     Because of discrimination, hostile work environment, and unlawful retaliation, Peaster has suffered economic loss in diminished past and future earnings and benefits including lost stock in the Company, and other contractual benefits promised to Peaster, in amounts to be proven at trial.

69.     Because of discrimination, hostile work environment, and unlawful retaliation, Peaster has suffered emotional distress, humiliation, and related physical suffering.

70.     And the Company's announcement (or leak) of Peaster's termination has damaged his professional reputation and future prospects.

## Malice & Intent

71.     The Company's discriminatory, hostile, and retaliatory conduct towards Peaster in 2022 was perpetrated by the CEO, Kempczinski, and the General Counsel, Ralls-Morrison.    These were not the random acts of rogue managers that the Company could not control; it was literally the Company.

72.     The Defendants' discriminatory, hostile, and retaliatory conduct towards Peaster in 2022 was done with malice and must be punished and deterred by a substantial award of punitive damages.

73.     The Defendants' discriminatory, hostile, and retaliatory conduct towards Peaster in 2022 came after the Defendants were accused of civil rights violations based on race in other recent lawsuits. The Defendants are alleged serial violators of the federal civil rights law and will likely continue as violators until their conduct is adjudicated.

## § 1981 of the Civil Rights Act of 1870 (as amended)

74.     § 1981 of the Civil Rights Act of 1870, 42 U.S.C. § 1981 ("§ 1981") was enacted after the Civil War to empower the newly freed slaves and their descendants

to participate in the American economy and other aspects of American life on equal terms with White citizens.  It provides:

a)  **Statement of equal rights:**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

b)  **"Make and enforce contracts" defined:**

For this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

c)  **Protection against impairment:**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

75.  Peaster is a person within the jurisdiction of the United States.

76.  Peaster's employment by McDonald's is "contractual relationship" under § 1981.

77.  Under § 1981, Peaster has the same rights as White citizens to make and enforce his employment contracts with McDonald's, including the making, performance, modification, and termination of their contracts, and the enjoyment of all benefits, privileges, terms, and conditions of their employment relationships with McDonald's.

20

78.     Under § 1981, the Company's established customs and practices as to how Officers are treated are "benefits, privileges, terms, and conditions of their employment relationships with McDonald's."

79.     Under § 1981, the Company's established customs and practices as to "Rule of 68" calculations of the value of an employee's stock that the employee earned over the course of his or her employment are "benefits, privileges, terms, and conditions of their employment relationships with McDonald's."

80.     Under § 1981, Peaster engaged in protected activity when, without limitation, he (i) confronted Kempczinski during Kempczinski's Company town hall concerning Kempczinski's racist texts; and when (ii) he was interviewed by Company lawyers about a separate racial discrimination lawsuit.

81.     The conduct of these Defendants egregiously violates § 1981 and all other laws intended to promote racial equality in employment.  The full weight of 42 U.S.C. § 1981 must be brought to bear against these Defendants.


## COUNT I

## Michael Peaster's Claim Against All Defendants For Disparate Treatment Based Upon Race Violating 42 U.S.C. § 1981

82.     Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1-81 against both Defendants as though set forth herein.

83.     As alleged in this Complaint, McDonald's Corporation and Christopher Kempczinski violated 42 U.S.C. § 1981 by engaging in disparate treatment toward Peaster compared to their treatment of White Officers regarding to his employment

by the Company and the "benefits, privileges, terms, and conditions" of his employment.

84.     Without limitation, the Defendants' disparate treatment of Peaster in in contrast to the respect White Officers receive at McDonald's included:

      a.  Kempczinski's ongoing attempt to ostracize and ignore Peaster; his ongoing refusal to meet with Peaster; and his refusal to allow Peaster to fly with him on the corporate jet.

      b.  Kempczinski's and Ralls-Morrison's continuing refusal to approve Peaster's proposals to provide enhanced security; or provide alternatives; or to even discuss the subject with Peaster, even theough they demanded that Peaster provide increased security.

      c.  Kempczinski's and Ralls-Morrison's phony criticisms of Peaster's performance; and

      d.  The Company's pretextual termination of Peaster.

85.     Defendant Christopher Kempczinski, who Peaster was employed to protect, is liable on Count I as he personally caused Peaster to suffer disparate treatment, acting directly or through Ralls-Morrison and/or other Company employees.

86.     Defendant McDonald's Corporation is liable for the disparate treatment against Peaster under the doctrine of *respondeat superior*.

87.     The Defendants' disparate treatment was based on Peaster's race. The Defendants punished Peaster because he spoke out as an African American about the

harm Kempczinski caused by sending racist texts and Kempczinski's related attempt to evade responsibility for his racism.

88.     The conduct of McDonald's Corporation and Kempczinski was intentional or in reckless disregard of Peaster's civil rights.

89.     As the direct and proximate result of the Defendants' violations of § 1981 as alleged in Count I, Peaster has suffered substantial damages, including without limitation:

> a.  Actual and consequential damages for economic loss in amounts to be proven at trial.
>
> b.  Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and
>
> c.  Damage to injury and reputation.

90.     McDonald's Corporation's and Kempczinski's discriminatory conduct was intentional and malicious, making punitive or exemplary damages necessary to punish these Defendants and deter other companies and executives from similar misconduct.

## **Prayer for Relief**

WHEREFORE, on Count I under 42 U.S.C. § 1981 and 42 U.S.C. § 1988, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A. Actual and consequential damages, both economic and non-economic, to be proven at trial;

B. Punitive damages sufficient to punish each Defendant and deter other companies and their executives from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

## COUNT II

### Michael Peaster's Claim Against All Defendants For Hostile Work Environment Violating 42 U.S.C. § 1981

91.     Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1 – 90 against Defendants McDonald's Corporation and Christopher Kempczinski as though set forth herein.

92.     McDonald's Corporation ("McDonald's") violated 42 U.S.C. § 1981 by subjecting Peaster to a hostile work environment, by allowing and fostering an intolerant atmosphere, and by failing or refusing to address blatant discrimination, disrespect, and disregard for African American and their workplace issues.

93.     Without limitation, the Defendants' acts or omissions constituting a hostile work environment include:

a. Treating Peaster as an "Invisible Officer" through Kempczinski's intentional campaign to ostracize Peaster as alleged herein.

b. Overtly disregarding Peaster's status as an Officer in failing to treat him like an Officer in terms, without limitation, of allowing an Officer to manage his department, meet with the CEO, fly on the Company jet.

c. Otherwise holding Peaster up for humiliation in the eyes of his peers.

d. Demanding Peaster increase security for executives but simultaneously undercutting Peaster's ability to satisfy those demands.

e. Manufacturing false criticisms of Peaster's performance about the Mexico City / São Paulo trips and the New York event; and

f. Terminating Peaster and threatening to revoke compensation rights Peaster earned through his thirty-five (35) years of diligent employment.

94. Defendant Christopher Kempczinski, who Peaster was employed to protect, is liable on Count II as he personally caused Peaster to suffer a hostile work environment, acting directly or through Ralls-Morrison and/or other Company employees.

95. Defendant McDonald's Corporation is liable for the hostile work environment against Peaster under the doctrine of *respondeat superior*.

96. The Defendants' imposed a hostile work environment on Peaster due to his race. The Defendants punished Peaster because he spoke out as an African

American on the subject of Kempczinski's racist texts and Kempczinski's related attempt to evade responsibility for his racism.

97. Peaster's work environment was both objectively and subjectively offensive. Objectively, a reasonable African American person in Peaster's position would find Peaster's work environment (one in which, without limitation, the CEO (Kempczinski) repeatedly avoided and attempted to ignore Peaster, the man in charge of executive protection), to be hostile or abusive. Subjectively, Peaster, himself, perceived the work environment to be hostile.

98. The conduct of McDonald's Corporation and Kempczinski was intentional or in reckless disregard of Peaster's civil rights.

99. As the direct and proximate result of the Defendants' violations of § 1981 as alleged in Count II, Peaster has suffered substantial damages, including without limitation:

    a. Actual and consequential damages for economic loss in amounts to be proven at trial.

    b. Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and

    c. Damage to injury and reputation.

100. Defendants' discriminatory conduct creating a hostile environment was intentional and malicious, making punitive or exemplary damages necessary to

punish these Defendants and deter other companies and executives from similar misconduct.

## **Prayer for Relief**

WHEREFORE, on Count II under 42 U.S.C. § 1981 and 42 U.S.C. § 1988, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A. Actual and consequential damages, both economic and non-economic, to be proven at trial;

B. Punitive damages sufficient to punish each Defendant and deter other companies and their executives from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

## **COUNT III**

### **Michael Peaster's Claim Against All Defendants For Unlawful Retaliation Violating 42 U.S.C. § 1981**

101. Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1-100 as though set forth herein against Defendants McDonald's Corporation and Christopher Kempczinski.

102. McDonald's termination of Peaster on November 7, 2022, effective December 31, 2022, was unlawful retaliation in violation of § 1981.

103. The stated reason for Peaster's termination (that Desiree Ralls-Morrison had lost confidence in his ability to protect the CEO), was pretextual. Peaster was not guilty of poor performance, and any alleged deficiencies were the intended result of Defendants' campaign to set Peaster up to be accused of failure. Furthermore:

      a. Peaster's supervisor – Malcom Hicks – was, on information and belief, not consulted about Peaster's termination or even told until a few days before that Peaster was being fired;

      b. Peaster's requests to increase the budget for his EPS teams and fill open positions and for Kempczinski to accept greater personal security, were repeatedly denied or ignored;

      c. Peaster's EPS team supported Kempczinski on over fifty (50) trips in 2022. Not once did Kempczinski or any other executive suffer any physical harm or face any significant safety threat; and

      d. In Peaster's thirty-five years of employment with McDonald's, Peaster was never rated below a "Significant Performer," and McDonald's has never put Peaster on a Performance Improvement Plan or written Peaster up for performance issues or concerns.

104. In reality, Defendants unlawfully retaliated against Peaster because he is African American, violating § 1981. Defendants feel threatened by Peaster speaking the truth on racial issues, including without limitation when Peaster spoke candidly about Kempczinski's racist texts at the town hall the Company convened

28

allegedly to provide a forum for this important discussion; and when Peaster spoke candidly to the Company's lawyers when he was interviewed by Company lawyers about a separate racial discrimination lawsuit.

105. In further retaliation, McDonald's has threatened to revoke certain rights to acquire valuable stock in McDonald's that Peaster has earned based on his years of loyal service. McDonald's threatened to withhold this earned benefit – known as the "Rule of 68" rights – in their effort to silence Peaster and dissuade him from asserting his civil rights.

106. Defendant Christopher Kempczinski, who Peaster was employed to protect, is liable on Count III as he personally caused Peaster to suffer retaliation, acting directly or through Ralls-Morrison and/or other Company employees.

107. Defendant McDonald's Corporation is liable for the retaliation against Peaster under the doctrine of *respondeat superior*.

108. As the direct and proximate result of the Defendants' violations of § 1981 as alleged in Count III, Peaster has suffered substantial damages, including without limitation:

    a. Actual and consequential damages for economic loss in amounts to be proven at trial.

    b. Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and

    c. Damage to injury and reputation.

109. The conduct of McDonald's Corporation and Kempczinski was intentional or in reckless disregard of Peaster's civil rights.

110. Defendants' unlawful and discriminatory retaliation was intentional and malicious, making punitive or exemplary damages necessary to punish these Defendants and deter other companies and executives from similar misconduct.

## **Prayer for Relief**

WHEREFORE, on Count III under 42 U.S.C. § 1981 and 42 U.S.C. § 1988, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

A. Actual and consequential damages, both economic and non-economic, to be proven at trial;

B. Punitive damages sufficient to punish each Defendant and deter other companies and their executives from like misconduct;

C. Costs of suit;

D. Attorneys' fees; and

E. Such other relief available under law and deemed just and proper.

## **COUNT IV**

## **Michael Peaster's Claim Against All Defendants For Intentional Infliction Of Emotional Distress**

111. Plaintiff Michael Peaster incorporates and re-alleges paragraphs 1—110 against both Defendants as though set forth herein.

112. As alleged in this Complaint, Defendants committed the tort of intentional infliction of emotional distress against Plaintiff Michael Peaster.

113.    The Defendants' conduct towards Peaster was extreme and outrageous beyond the bounds of acceptable conduct in a civilized society and professional workplace.

114.    Peaster, while being in charge of organizing security for the Defendants, was inherently worried for his clients and *everyone* at McDonald's Corporation, including Kempczinski.

115.    Despite knowing the inherent stressors Peaster experienced from his job as Vice President of security, the Defendants, together, intentionally, and repeatedly heightened this stress by:

   a. Cancelling and/or avoiding meetings with Peaster about the Company's and the Company's executives' security was to be discussed.

   b. Placing the Company and Peaster's clients at high risk by refusing to increase the budget to allow for improvements to security despite Peaster's insistence.

   c. Placing the Company and Peaster's clients at high risk by refusing to permit Peaster to fill open positions within his department.

   d. Demanding Peaster meet certain security demands while simultaneously engaging in conduct that made it impossible for Peaster to satisfy those security demands.

    e.   Falsely criticizing Peaster about alleged security concerns in Mexico City, Mexico and São Paulo, Brazil that purportedly threatened the safety of Kempczinski, Ralls-Morrison, and other executives when no such threat(s) existed .

    f.   Terminating Peaster on the false pretense that the Company no longer had confidence in Peaster's ability to protect the CEO (Kempczinski) or General Counsel (Ralls-Morrison).

116.   Because of the increased risks to those Peaster was to protect, he suffered heightened anxiety and humiliation because he believed that others in the company perceived him as incompetent.

117.   Kempczinski was personally involved in the outrageous conduct that caused Peaster's injuries claimed here. Kempczinski intentionally limited his interactions with Peaster, cancelled meetings with Peaster, was (on information and belief) the reason Peaster was not permitted to fly on the Company, and (on information and belief) was behind the Company's contradictory demands and conduct.

118.   McDonald's intended to humiliate Peaster and suffer emotional distress when the Company terminated him for unfounded, pretextual reasons. McDonald's threat to withhold Peaster's earned right to retain valuable stock compensation is further outrageous conduct intended to increase Peaster's anxiety.

119.    The Defendants' conduct toward Peaster was intended to, and was reasonably foreseeable to, cause Peaster or any other reasonable person in her position to suffer emotional distress.

120.    As the direct and proximate result of the Defendants' intentional infliction of emotional distress, Peaster has suffered substantial damages, including without limitation:

    a.  Actual and consequential damages for economic loss in amounts to be proven at trial.

    b.  Substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights; and

    c.  Damage to injury and reputation.

121.    The Defendants' conduct was intentional and malicious.

122.    Punitive Damages in an amount to be determined by the jury are necessary to punish the Defendants and to deter future misconduct.

## **Prayer for Relief**

WHEREFORE, on Count IV his complaint, Plaintiff Michael Peaster requests the entry of judgment against each Defendant imposing individual and joint and several liability for:

    A.  Actual and consequential damages, both economic and non-economic, to be proven at trial;

B.  Punitive damages sufficient to punish each Defendant and deter other companies and their executives from like misconduct;

C.  Costs of suit; and

D.  Such other relief available under law and deemed just and proper.

### JURY TRIAL DEMANDED

123.  Plaintiff Michael Peaster demands trial by jury in open court.

Dated: December 14, 2022

Respectfully submitted,

**PLAINTIFF MICHAEL PEASTER**

By:     */s/ Carmen D. Caruso*

Carmen D. Caruso (# 6189462)
cdc@cdcaruso.com
William B. Whitner(# 6331564)
wbw@cdcaruso.com

CARMEN D. CARUSO LAW FIRM
77 West Washington Street, Suite 1900
Chicago, IL 60602
(312) 626-1160