**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Michael Peaster, | |
| *Plaintiff,* | No. 22 CV 7037 |
| v. | Judge Lindsay C. Jenkins |
| McDonald's Corporation, *et al.,* | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Michael Peaster brings this suit against his former employer, McDonald's Corporation, and its CEO, Christopher Kempczinski (collectively, "Defendants"). Peaster alleges that Defendants subjected him to racial discrimination and retaliation in violation of 42 U.S.C. § 1981 and intentional infliction of emotional distress. [Dkt. 1.] Before the Court is Defendants' motion to dismiss for failure to state a claim. [Dkt. 16.] For the reasons stated below, the motion is granted in part and denied in part.

## I. Background

The following facts are taken from the Complaint. [Dkt. 1]. All well-pleaded factual allegations are assumed to be true for purposes of Defendants' motion to dismiss. *Deb v. SIRVA, Inc.*, 832 F.3d 800, 808–09 (7th Cir. 2016). Peaster is an African American man who worked at McDonald's for 35 years, including 10 years as head of corporate safety, security, and intelligence. [Dkt. 1 ¶ 7.] On January 1, 2022, he was named Vice President of Global Safety, Security, and Intelligence and was

"re-promoted" to the "Officer" level. [*Id.* ¶ 8.] He reported to and worked with McDonald's General Counsel, Desiree Ralls-Morrison. [*Id.* ¶¶ 8, 10.]

In the fall of 2021, text messages from Kempczinski to then-Chicago Mayor Lori Lightfoot became public. [*Id.* ¶ 12.] The texts concerned the shooting of a child in a McDonald's parking lot. [*Id.*] Peaster characterizes Kempczinski's text messages as "blam[ing] the child's parents for exposing her to violence." [*Id.*] The texts were branded as racist and generated a "hostile media storm." [*Id.* ¶¶ 12–13.] Kempczinski publicly apologized, saying that his messages were "wrong" and reflected a "very narrow worldview." [*Id.* ¶ 13.]

Kempczinski also called a meeting at McDonald's corporate headquarters to discuss the texts, which Peaster attended. [*Id.* ¶¶ 13–14.] Peaster thought Kempczinski's remarks showed he was "in denial" about why others viewed the texts as racist. [*Id.* ¶ 14.] Peaster's feeling was reinforced when another employee asked Kempczinski, "What would you say to those who agreed with your comments?" and Kempczinski replied, "I would say you would have to look at your values, and then make the right decision." [*Id.*] Peaster interpreted this response as "evasive, or worse"; he "rebuked Kempczinski's response," saying:

> To those employees who agreed with Christopher Kempczinski's comments, think about their fellow employees who are in the room who live in the neighborhoods being discussed. Think about the kids who are in their homes and playing on playgrounds who are killed by stray bullets. We cannot broad brush the violence issues in Chicago to make it appear that all parents who have children who are victims to gun violence are bad parents. We have to have empathy and compassion for the majority of families who live in tough communities that work hard to provide for their family and keep them safe.

[*Id.*] According to Peaster, other employees applauded Peaster's remarks, but Kempczinski did not respond. [*Id.* ¶ 15.]

After the meeting, Peaster alleges that Kempczinski began discriminating against Peaster based on race and retaliating against Peaster because he spoke up at the meeting. [*Id.* ¶ 16.] Peaster alleges that Kempczinski, personally and through subordinates, discriminated and retaliated against him in several ways.

Peaster alleges Kempczinski denied him ordinary opportunities and benefits associated with his Officer role that Kempczinski granted to white Officers. [*Id.* ¶ 83.] Kempczinski ignored and refused to meet with Peaster to discuss job-related topics, even though normal company practice was for the CEO to accept Officers' meeting requests routinely. [*Id.* ¶¶ 17–22, 26–29.] At an Officers' meeting, Kempczinski congratulated all new Officers except Peaster. [*Id.* ¶¶ 30–31.] At Kempczinski's direction, Ralls-Morrison refused to allow Peaster to fly on the company jet on business trips, a normal perk for Officers. [*Id.* ¶¶ 41–48.]

Additionally, Peaster alleges that Defendants undermined his ability to do his job effectively and set him up to fail as a pretext for terminating him. [*Id.* ¶ 36.] Defendants achieved this, the Complaint says, by demanding Peaster enhance security while refusing to provide meaningful budget increases or to allow Peaster to fill vacancies in his department. [*Id.* ¶¶ 23–25, 32–38, 53–56.] Kempczinski and Ralls-Morrison also blamed Peaster for "inconveniences" and security issues caused by Peaster flying separately during travel [*id.* ¶¶ 49–51], and for an incident during a New York trip when labor union activists entered a ballroom when Kempczinski

was present [*id.* ¶¶ 57–59]. Peaster alleges that these incidents would not have occurred if Defendants had followed ordinary company practice, expanded his department's budget, and permitted him to fill vacancies. [*Id.* ¶¶ 50–51, 59.]

As a result of these incidents, Peaster alleges he became increasingly anxious and emotionally distressed. By October 2022, these feelings became unbearable, and he asked to speak to Ralls-Morrison because he feared for McDonald's executives' safety. [*Id.* ¶¶ 60–62.] Peaster and Ralls-Morrison met on November 7, 2022, and she told him he was being terminated for performance issues. [*Id.* ¶ 63.] Peaster believed that the actual basis for firing him was racial discrimination and retaliation [*id.* ¶ 65], prompting this lawsuit. Peaster's four-count Complaint asserts three claims under 42 U.S.C. § 1981 and a claim for intentional infliction of emotional distress under Illinois law. [Dkt. 1.] Defendants now move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). [Dkt. 16.]

## II.  Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleadings. "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court "accept[s] all well-pleaded facts as true and draw all reasonable inferences in plaintiff's favor." *Id.* at 600 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)).

4

### III.   § 1981 Claims

Defendants move to dismiss Peaster's three claims arising under 42 U.S.C. § 1981, for disparate treatment (Count I), hostile work environment (Count II), and retaliation (Count III). "Section 1981 protects the right of citizens regardless of race in the context of employment to have the same right to enforce and make contracts." *Singmuongthong v. Bowen*, —F.4th—, 2023 WL 5030095, at *1 (7th Cir. Aug. 8, 2023) (citing *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1015 (2020)). It also protects against retaliation for engaging in statutorily protected activity. *Catinella v. County of Cook*, 881 F.3d 514, 519 (7th Cir. 2018) ("The Supreme Court has interpreted [§ 1981] to confer a cause of action on a person who suffers retaliation 'because he ... tried to help a different individual, suffering direct racial discrimination, secure his § 1981 rights.'" (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452 (2008))).

The required analysis for claims under § 1981 is "largely identical" to the analysis for Title VII claims, *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022), with two main exceptions. First, § 1981 prohibits racial discrimination alone, while Title VII also prohibits other types of discrimination. *Id.* Second, a § 1981 plaintiff must prove "race was a but-for cause of [his] injury," whereas a Title VII plaintiff need only establish that race was a "motivating factor." *Id.* (quoting *Comcast*, 140 S. Ct. at 1014, 1017). The Court draws on Title VII precedent where appropriate while considering Defendants' motion to dismiss Peaster's § 1981 claims.

### A.     Count I: Disparate Treatment

Defendants argue that Peaster's disparate treatment claim should be dismissed, but their arguments also apply in part to his other § 1981 claims. For the reasons discussed below, the Court denies Defendants' motion to dismiss Count I and rejects these arguments as applied to Peaster's other claims.

#### 1. Causation

Under the Supreme Court's *Comcast* decision, a § 1981 "plaintiff must initially plead … that, but for race, [he] would not have suffered the loss of a legally protected right." 140 S. Ct. at 1019; *see also Catinella*, 881 F.3d at 519 (explaining that reporting conduct that violates § 1981 is also statutorily protected). Peaster's theory is that McDonald's and Kempczinski discriminated against him because he is African American by excluding him from benefits other Officer-level employees received, undermining his ability to do his job effectively, falsely accusing him of poor performance, and using those performance issues as a pretext to fire him. [Dkt. 1 ¶¶ 82–87.] Defendants argue that Peaster failed to allege facts making it plausible that race was a but-for cause of any of Defendants' conduct. [Dkt. 17 at 3–5.]

Defendants first argue that Peaster's allegations of racial discrimination are conclusory factual allegations and legal conclusions that the Court can disregard. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 851, 856 (7th Cir. 2021). Without these allegations, they contend, Peaster has not plausibly alleged that race was the cause of any adverse employment action. [Dkt. 17 at 4.] The Court disagrees with this characterization of the Complaint. Peaster alleges McDonald's and Kempczinski subjected him to poorer treatment than his white peers, including: (1) requesting Peaster enhance security

but denying his requests for budget increases to fill vacancies in the department, inconsistent with normal company practice [Dkt. 1 ¶¶ 23–25, 32–38, 53–56]; (2) refusing to allow Peaster to meet with Kempczinski, which was "one perk of being an Officer" [*id.* ¶¶ 26–29]; (3) Kempczinski congratulating all Officers except Peaster at a meeting [*id.* ¶¶ 30–31]; (4) refusing to permit Peaster to fly on the company jet, when Officers customarily flew on the jet and Peaster's absence undermined his job performance [*id.* ¶¶ 41–48]; (5) blaming Peaster for the results of McDonald's failure to increase the security budget or fill vacancies [*id.* ¶ 59]; and (6) using purported performance issues as a pretext for firing Peaster [*id.* ¶¶ 61–63]. These are not legal conclusions or bare factual allegations, so the Court rejects Defendants' contention that it should disregard them.

Next, Defendants argue that Peaster's admission that labor union activists approached Kempczinski in New York [*id.* ¶¶ 57–59] establishes that this security breach was the reason for Peaster's termination such that his race could not have been a but-for cause [Dkt. 17 at 4–5]. This argument is flawed. Defendants read more into this incident than Peaster concedes in his Complaint, calling it a "major security incident," and stressing that the importance of protecting the CEO "cannot be overstated." [*Id.* at 4.] But at this stage, the Court takes Peaster's allegations as true and construes them in his favor. *Cochran*, 828 F.3d at 599. Peaster alleges that Defendants caused the conditions that resulted in the security breach by preventing him from running the security department effectively, which Defendants used as a pretext for firing him. [Dkt. 1 ¶¶ 59, 67, 84.] If Peaster's version of events is true, as

the Court assumes for present purposes, the existence New York incident would not prevent race from being a but-for cause of Peaster's termination, even if the security breach was as serious as Defendants contend.

Defendants also argue that by pursuing both a disparate treatment and a retaliation claim, Peaster pleads himself out of court because "identification of multiple possible motives for the alleged adverse treatment" precludes arguing "that race was *the* determining factor." [Dkt. 17 at 5.] The Seventh Circuit has not decided whether *Comcast*'s but-for causation standard permits a § 1981 plaintiff to pursue multiple theories of discrimination at the pleading stage, but the Court concludes that it does. By its terms, *Comcast* does not rule out such pleading; the Supreme Court simply held that a but-for causation standard, not Title VII's lesser standard, applies to § 1981 claims.  140 S. Ct. at 1017–19. This causation standard is not necessarily inconsistent with pleading that an adverse employment action had two but-for causes, *see Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020) ("Often, events have multiple but-for causes."), or that either of two factors was the only but-for cause, provided that the complaint properly pleads in the alternative, *see United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 584–85 (7th Cir. 2021) ("[A]lternative pleading is both permitted and routine." (citations omitted)); *cf. Arora v. Nav Consulting Inc.*, 2022 WL 7426211, at *3 (N.D. Ill. Oct. 13, 2022) (noting that pleading in the alternative is consistent with *Comcast* but granting judgment on the pleadings because plaintiff "d[id] not really plead *in the alternative*").

Peaster is not clear about whether he alleges the but-for cause of the discrimination he faced was his race, protected § 1981 activity, or both. He alleges that "[t]he Defendants' disparate treatment was based on Peaster's race. The Defendants punished Peaster because he spoke out as an African American about the harm Kempczinski caused by sending racist texts and Kempczinski's related attempt to evade responsibility for his racism." [Dkt. 1 ¶ 87.] Defendants argue that this allegation conflates two separate causes of the alleged discrimination, Peaster's race and his speech at the staff meeting. [Dkt. 17 at 5.] But even if Defendants are correct, Peaster would still properly allege but-for causation.

Where courts have dismissed § 1981 claims for failing to plead that race was a but-for cause of the alleged discrimination, the plaintiffs have articulated a theory of discrimination based, at least in part, on a characteristic § 1981 does *not* protect. *See, e.g.*, *Arora*, 2022 WL 7426211, at *2 (race plus ethnicity and national origin); *James v. City of Evanston*, 2021 WL 4459508, at *10 (N.D. Ill. Sept. 29, 2021) (desire to avoid public scrutiny, in analogous 42 U.S.C. § 1982 context); *Vang v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 5761002, at *9 (C.D. Ill. Dec. 3, 2021) (national origin). Here, Peaster's allegations are meaningfully different because both possible bases for his § 1981 claim—his racial identity and statutorily protected activity—are protected under the statute. *Singmuongthong*, 2023 WL 5030095, at *1; *Catinella*, 881 F.3d at 519. To the extent that Peaster alleges one or both bases was a but-for cause of disparate treatment, he has properly pleaded causation under *Comcast*.

A more difficult question is whether Peaster can argue that his race combined with his protected activity was a but-for cause of the disparate treatment, even if each factor alone would not have been a but-for cause. In other words, does Peaster have a viable § 1981 claim if he faced disparate treatment because he was an African American who engaged in protected activity, but Defendants would not have discriminated against an African American who did not engage in protected activity or a white employee who did? The Court is unaware of any other court addressing this precise issue, *cf. Arora*, 2022 WL 7426211, at *2 & n.2 (declining to address whether the plaintiff could claim both his race and his ethnicity—an aspect of race for § 1981 purposes—was the but-for cause of the alleged discrimination), but caselaw suggests that Peaster may proceed on this theory. In employment discrimination cases, "courts must evaluate all evidence as a whole," *Singmuongthong*, 2023 WL 5030095, at *1 (citations omitted), and the Seventh Circuit has indicated that discrimination based on the combination of two or more protected characteristics is actionable, *see Scaife v. U.S. Dep't of Veterans Affairs*, 49 F.4th 1109, 1118 (7th Cir. 2022) (considering, in the Title VII context, whether the evidence supported a hostile environment based on the combination of race and gender discrimination). Applying analogous reasoning here, *see Lewis*, 36 F.4th at 759, the Court concludes that a § 1981 plaintiff may plead that discrimination based on the combination of two protected characteristics was a but-for cause of disparate treatment. This conclusion also makes logical sense: it would be odd for a defendant to escape liability under § 1981 by discriminating based on two protected characteristics instead of just one.

The Court therefore holds that whether Peaster pleaded that race and protected activity were independently but-for causes or combined into a single but-for cause, his allegations satisfy the *Comcast* standard.

### 2. Scope of Adverse Employment Action

Defendants argue that the Court should limit the scope of Peaster's § 1981 claims to his ultimate termination because none of Peaster's other allegations rise to the level of an adverse employment action. [Dkt. 17 at 5–6.] "A materially adverse employment action is one where the plaintiff suffers 'a significant change in employment status.'" *Reives v. Ill. State Police*, 29 F.4th 887, 894 (7th Cir. 2022) (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)). Seventh Circuit precedent recognizes three general categories of adverse employment actions: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Id.* (quoting *Barton v. Zimmer*, 662 F.3d 448, 453–54 (7th Cir. 2011)). But not every change an employee is unhappy about is an adverse employment action; nor are negative evaluations that are unaccompanied by a tangible consequence. *Id.* Defendants argue that Kempczinski giving Peaster the cold shoulder, Ralls-Morrison's refusal to allow him to fill vacancies in his department or to fly on the company jet, and Kempczinski's and Ralls-Morrison's criticism of Peaster's performance are not adverse employment actions. [Dkt. 17 at 5–6.] It therefore asks the Court to dismiss claims that are based on these allegations. [*Id.* at 7.]

11

Based on Peaster's allegations, however, the Court cannot say as a matter of law that no event besides Peaster's termination could be an adverse employment action. Peaster alleges that Kempczinski refused to meet with him, even though meeting with the CEO is a perk of being an Officer and meeting requests are routinely granted. [Dkt. 1 ¶¶ 26–29.] Peaster alleges that he was prevented from filling openings in his department and that Kempczinski refused to have security agents near him, which hampered Peaster's ability to provide necessary security. [*Id.* ¶¶ 32–37.] According to Peaster, these departures from normal company practice set him up for failure. [*See id.* ¶¶ 38, 51.] Likewise, being unable to fly on the company jet, ordinary practice for an Officer, inhibited Peaster's ability to provide security. [*Id.* ¶¶ 41–50.] These issues were part of Ralls-Morrison's justification for firing him. [*Id.* ¶ 63.] These facts, if true, could support the conclusion that Peaster experienced an adverse employment action in the form of "changes in job duties" that "reduce[d] further career prospects" at McDonald's. *See Reives*, 29 F.4th at 894 (internal quotation marks omitted). Thus, the Court cannot say as a matter of law that Peaster's only possible § 1981 claim relates to his termination.

It is also unclear what effect narrowing the scope of Peaster's claims would have at this stage in the litigation. Peaster's disparate treatment and retaliation claims are based on his termination, in addition to the allegations Defendants identify [Dkt. 1 ¶¶ 84, 102], so even if the Court agreed with Defendants, the claims would not be dismissed in their entirety. Seventh Circuit precedent requires the courts or factfinders to "evaluate all evidence [of discrimination] as a whole,"

*Singmuongthong*, 2023 WL 5030095, at *1 (citations omitted), so even if the Court were inclined to limit the scope of Peaster's claims at this stage, the other incidents would remain relevant and discoverable, *see* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case ...."). Knowing which specific events Peaster intends to argue are adverse employment actions may be important later, and if Peaster fails to produce sufficient evidence to support some of his contentions, Defendants can seek summary judgment on those theories.

### 3. Kempczinski as a Defendant

Defendants also argue that Kempczinski is not a proper defendant because Peaster has failed to plead facts from which a factfinder "could conclude that Kempczinski intended to discriminate or retaliate against [Peaster] ...." [Dkt. 17 at 14–15 (citations omitted).] The Court disagrees. As discussed above, Peaster has pleaded facts that make it plausible to conclude that the changes to his job duties were an adverse employment action, and he alleges that Kempczinski directed Ralls-Morrison to take some of these actions. [Dkt. 1 ¶¶ 41–48.] He further alleges that Kempczinski directly discriminated and retaliated against him, including by refusing to meet and refusing to accept the additional security Peaster recommended. [*Id.* ¶¶ 26–29, 37–38.] The Court must accept these allegations as true, and therefore declines to dismiss Kempczinski as a defendant.

### B. Count II: Hostile Work Environment

Defendants move to dismiss Count II, the § 1981 hostile work environment claim. To prevail, Peaster must allege facts making it plausible that "(1) the work

environment was both subjectively and objectively offensive; (2) the harassment was based on [race]; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (quoting *Scaife*, 49 F.4th at 1115–16) (Title VII); *accord Paschall v. Tube Processing Corp.*, 28 F.4th 805, 812–14 (7th Cir. 2022) (§ 1981). Defendants argue that Peaster fails to allege sufficiently severe or pervasive conduct. [Dkt. 17 at 7.] The Court agrees.

The Seventh Circuit describes a hostile work environment as one "permeated with discriminatory intimidation, ridicule, and insult." *Trahanas*, 64 F.4th at 853 (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). Peaster's allegations fail to rise to this level. The hostility he identifies derives primarily from being ignored, excluded from expected privileges, or passed over for praise. [*See* Dkt. 1 ¶ 20 (treating Peaster like an "Invisible Officer"), ¶¶ 26–29 (refusing to meet with Peaster), ¶¶ 30–31 (praising everyone except Peaster), ¶¶ 41–47 (excluding Peaster from the company jet).] This subtle undermining may have been harmful and—if based on discriminatory or retaliatory motives—may be actionable, but Peaster does not allege the kind of overt hostility present in viable hostile work environment claims. *See, e.g.*, *Alamo v. Biss*, 864 F.3d 541, 550–51 (7th Cir. 2017) (racial slurs, stealing and throwing away food, and physical altercations); *Huri v. Off. of the C.J. of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 830–31 (7th Cir. 2015) (supervisor called others "good Christians," called Muslim plaintiff "evil," screamed at plaintiff, and subjected plaintiff to harsher scrutiny than coworkers). The Court grants Defendants' motion to dismiss Count II.

14

### C.    Count III: Retaliation

Defendants also move to dismiss Count III, Peaster's § 1981 retaliation claim. "To state a retaliation claim under § 1981 based on events occurring in the workplace, an employee must show that [ ]he suffered a materially adverse action because [ ]he engaged in protected activity." *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016) (citations omitted). An employee engages in protected activity when he "complain[s] to [his employer] of conduct that he reasonably and in good faith believed to be unlawful discrimination." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 629 (7th Cir. 2011) (citation omitted); *see Catinella*, 881 F.3d at 519 (describing protected activity as "tr[ying] to help a different individual, suffering direct racial discrimination, secure his § 1981 rights" (quoting *CBOCS W.*, 553 U.S. at 452). Reporting discrimination that is not "directly 'related to employment or occur[ing] in the workplace'" may still be protected activity under § 1981, provided that the discrimination was "caused by contract- or employment-related events." *Shott*, 829 F.3d at 497 (citation omitted) (quoting *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006)). This is all to say that Peaster has pleaded a § 1981 retaliation claim if he plausibly alleged that his employer retaliated against him for complaining about or trying to protect others from employment-related racial discrimination. *Id.*; *O'Leary*, 657 F.3d at 629.

Defendants argue that Peaster does not state a retaliation claim because he alleges no protected activity. [Dkt. 17 at 9–12; Dkt. 33 at 10–11.] Peaster identifies two instances of protected activity: first, when he "rebuked" Kempczinski's response to an audience question at the fall 2021 staff meeting regarding Kempczinski's text

messages and, second, when he "candidly answered" questions asked by McDonald's lawyers during a July 2022 meeting about a former employee's racial discrimination lawsuit. [Dkt. 1 ¶¶ 12–16, 39–40.] Defendants argue that these actions were not protected activity because Peaster's comments contained no advocacy against or reports of discrimination prohibited by § 1981. [Dkt. 17 at 9–11.]

The Court agrees with Defendants that Peaster fails to allege he engaged in protected activity during the July 2022 meeting. Peaster alleges only that he spoke with lawyers defending McDonald's in another § 1981 civil rights suit, that he "was interviewed as a possible witness," and that he "candidly answered each question [the lawyers] posed." [Dkt. 1 ¶¶ 39–40.] He provides no further detail regarding the topic of conversation, the nature of the questions posed, or the answers he gave. His vague allegations do not support a reasonable inference that the lawyers engaged in racial discrimination prohibited by § 1981 or that McDonald's conduct at issue in the lawsuit constituted such discrimination. *See O'Leary*, 657 F.3d at 629 (explaining that protected activity must relate to "conduct that [the employee] reasonably and in good faith believe[s] to be unlawful discrimination" (citation omitted)). Peaster's allegation that he gave candid answers, without more, does not support a reasonable inference that he complained about or reported employment-related racial discrimination. *See Shott*, 829 F.3d at 497. While these allegations may be consistent with retaliation for engaging in protected activity, without more detail, Peaster's allegations "stop[ ] short of the line between possibility and plausibility …." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Peaster's comments at the staff meeting regarding Kempczinski's text messages, however, are another matter. Read in context, Peaster plausibly alleges he engaged in protected activity. According to the Complaint, the meeting occurred after Kempczinski's text messages became public, sparked "substantial public outrage," and were "branded … as racist." [Dkt. 1 ¶¶ 12–13.] Kempczinski publicly apologized for his texts, which he described as "wrong" and reflecting a "very narrow worldview." [*Id.* ¶ 13.] Kempczinski convened a staff meeting to discuss the texts, but based on his remarks, Peaster thought "Kempczinski was in denial as to *why* many people believed his texts were racist and were offended." [*Id.* ¶ 14.] Peaster thought Kempczinski's response to another employee's was "evasive, or worse," so Peaster spoke out at the meeting, offering a "rebuke[ ]" of Kempczinski's response. [*Id.*] Other employees, in apparent agreement, applauded Peaster. [*Id.* ¶ 15.]

Taking these allegations as true, Peaster has alleged protected activity under § 1981. Peaster spoke up during a staff meeting about Kempczinski's discussion of the texts. Peaster referenced the effects that Kempczinski's comments and the attitudes underlying them could have on "their fellow employees who are in the room" who may "live in tough communities" but "work hard to provide for their family and keep them safe." In context, it is reasonable to infer that Peaster was attempting to speak up for African American employees who believed the text messages wrongly blamed parents and that Kempczinski's comments failed to condemn certain

17

attitudes that might have been held by other McDonald's employees. Thus, Peaster plausibly alleges that he "complained to [Kempczinski] of conduct that he reasonably and in good faith believed to be unlawful discrimination." *O'Leary*, 657 F.3d at 629 (citation omitted).

Defendants dispute that Peaster's comments were protected activity under § 1981. In their view, his remarks "d[id] not reflect any advocacy against unlawful discrimination under Section 1981" because they did not indicate he was complaining of racially discriminatory treatment or even mention race explicitly. [Dkt. 17 at 10.] Defendants are correct that "to be classified as a statutorily protected activity [a] complaint needs 'to at least say something to indicate discrimination is at issue.'" *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011) (quoting *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000)). But at the motion-to-dismiss stage, the Court takes Peaster's factual allegations as true and draws reasonable inferences in his favor. *Cochran*, 828 F.3d at 600. Here, the context—an official staff meeting for the purpose of discussing allegedly racist text messages—permits the reasonable inference that Peaster's comments were intended and understood as a complaint about how Kempczinski's texts and his response to the backlash affected African American employees of McDonald's. If Peaster's account is true, the racially discriminatory harm was "caused by … employment related events," so Peaster's response was protected activity under § 1981. *Shott*, 829 F.3d at 497 (citations omitted); *see also O'Leary*, 657 F.3d at 631 (explaining that complaining about activity an employee mistakenly thinks is discrimination is protected activity).

These allegations are sufficient to state a plausible § 1981 retaliation claim. The Court denies Defendants' motion to dismiss Count III.

## IV.  Intentional Infliction of Emotional Distress

In addition to his § 1981 claims, Peaster brings a claim for intentional infliction of emotional distress ("IIED") under Illinois law. [Dkt. 1 ¶¶ 111–19.] Defendants move to dismiss, arguing that Peaster's IIED claim is preempted by the Illinois Human Rights Amendment ("IHRA"), which prevents state courts from hearing cases involving "an alleged civil rights violation other than as set forth in [the IHRA]." 775 ILCS 5/8-111(D). [Dkt. 17 at 12.] That preemption provision also prevents a plaintiff from pursuing a preempted state law tort claim in federal court. *See Smith v. Chi. Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1151 (7th Cir. 1999). Peaster acknowledges that if "the core of [his] theory" is racial discrimination or retaliation, *id.*, his IIED claim is preempted [Dkt. 27 at 15]. To avoid preemption, Peaster frames his IIED claim not on racial discrimination, but rather "on [his] concern for the safety and security of McDonald's Corporate's personnel and property": while attempting to punish Peaster, McDonald's took "increased risks" that were "outrageous" and actionable in an IIED claim. [*Id.* at 15.] Defendants argue that to the extent the IIED claim is not preempted, Peaster has failed to allege outrageous conduct. [Dkt. 17 at 12–14; Dkt. 33 at 12.] Because the parties agree on the scope of preemption, the Court limits its discussion to whether Peaster has stated an IIED claim based on the security risks to which McDonald's is alleged to have exposed its executives.

To state a claim for IIED under Illinois law, a plaintiff must allege, among other elements, conduct that is "truly extreme and outrageous." *Feltmeier v.*

*Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (internal quotation marks omitted). To be outrageous, "the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Id.* at 80–81 (citation omitted). "Whether conduct is extreme and outrageous is judged on an objective standard, based on the facts of the particular case." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citation omitted).

Defendants' alleged conduct here was not objectively extreme and outrageous. Although Peaster argues that "[t]he increased risks McDonald's was taking in its [z]eal to punish Peaster were outrageous" [Dkt. 27 at 15 (citation omitted)], his allegations focus on his own subjective reaction to this conduct [Dkt. 1 ¶¶ 114–15]. The Court accepts these allegations as true, but Peaster fails to explain why an objective observer would view Defendants' conduct as outrageous, and the caselaw he cites is readily distinguishable because it involves more blatantly offensive conduct. *See Spahn v. Int'l Quality & Productivity Ctr.*, 211 F. Supp. 2d 1072, 1077 (N.D. Ill. 2002) (denying motion to dismiss where plaintiffs alleged "allege inappropriate and offensive sexual comments, unwelcome and unwanted sexual advances, and numerous occasions of harmful and offensive touching by their superior" and collecting similar cases). Peaster also frames Defendants' conduct as retaliation, but "in the absence of conduct calculated to coerce an employee to do something illegal, [Illinois] courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress." *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679,

684 (Ill. App. Ct. 1999). This analysis does not change even though Defendants have stated that the facts Peaster alleges, if true, are "inconsistent with McDonald's values." [Dkt. 17 at 1.] Conduct can be inconsistent with corporate values without being extreme and outrageous under Illinois IIED law. For these reasons, the Court grants Defendants' motion to dismiss Count IV.

## IV.    Conclusion

Defendants' motion to dismiss [Dkt. 16] is granted as to Count II (§ 1981 hostile environment) and Count IV (intentional infliction of emotional distress) and denied as to Count I (§ 1981 disparate treatment) and Count III (§ 1981 retaliation). The Court dismisses Counts II and IV because Peaster has failed to allege facts making it plausible that he is entitled to relief. Defendants argue that the dismissals should be with prejudice, but "[t]he law is clear that a court should deny leave to amend only if it is certain that amendment would be futile or otherwise unwarranted." *Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022) (citations omitted). It may be possible for Peaster to cure the defects the Court has identified, so granting leave to amend would not be futile. *See id.* Counts II and IV are therefore dismissed without prejudice. Peaster may file an amended complaint by or before September 19, 2023. Discovery is in progress and will continue in any event.

Enter: 22-cv-7037
Date:  August 22, 2023

_____
Lindsay C. Jenkins
United States District Judge