UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Michael Peaster, <br><br> *Plaintiff,* <br><br> v. <br><br> McDonald's Corporation *and* Christopher Kempczinski, <br><br> *Defendants.* | No. 22 CV 7037 <br><br> Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

In November 2021, McDonald's Chief Executive Officer Christopher Kempczinski convened a town hall to address leaked text messages to then-Mayor Lori Lightfoot, which discussed shootings at two McDonald's restaurants in Chicago. [Dkt. 176 ¶ 3; Dkt. 190 ¶ 3.][1] Michael Peaster, formerly a senior leader in McDonald's security department, attended the event and shared his belief that Kempczinski was in denial about the effect of his messages. [*Id.* ¶ 5.] One year later, McDonald's terminated Peaster after multiple security incidents, which he alleges occurred because he was prevented from running his department effectively. [Dkt. 176 ¶ 84.] He then sued both Kempczinski and McDonald's (together, "Defendants") for race discrimination and unlawful retaliation, and both defendants moved for summary judgment. Because Peaster has failed to introduce evidence permitting a jury to find that he was targeted for either his race or engaging in a protected activity, Defendants are entitled to summary judgment on both claims.

**I.   Background**

The court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed except where otherwise noted.[2] [Dkts. 176, 190.] It views the

---

[1]   Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2]   "On summary judgment, the court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires the moving party to file a statement of material facts with citations to specific supporting evidence in the record. L.R. 56.1(a)(2); *see also* L.R. 56.1(d). The opposing party must then respond to each fact by either admitting it or disputing it with its own supporting evidence. L.R. 56.1(b)(2); *see also* L.R. 56.1(e). The non-moving party may also file additional facts supporting its position. L.R. 56.1(b)(3). Peaster, in his response, often disputes only part of Defendants' fact, or fails to

1

record in the light most favorable to Peaster. *See Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023).

Peaster, who is Black, began his career at McDonald's in 1987. [Dkt. 190 ¶ 1.] By 2012, he had risen to lead the company's Global Safety, Security, and Intelligence (GSSI) Department, which—among its many responsibilities—oversaw Kempczinski's protection. [Dkt. 190 ¶ 2; Dkt. 176 ¶¶ 7–8.]

In November 2021, Kempczinski convened a company town hall to apologize for controversial text messages concerning shootings at McDonald's Chicago restaurants. [Dkt. 190 ¶¶ 3–4.] Peaster, who was in attendance, believed Kempczinski "was in denial about the effects of his texts," and, when invited, "commented on the issues of violence in Chicago, how people who lived in the affected communities might have perceived the text messages, and other issues 'outside of McDonald's.'" [Dkt. 176 ¶ 5, Dkt. 190 ¶ 5.]

In his comments, Peaster also referenced a prior conversation he had "with a young man in the UK." [*Id.*] Specifically, Peaster shared that he told the man, who asked about circumstances in 1987, that people today are still "talking about" issues of pay equality and equal opportunities for people of color. [*Id.*] Defendants contend that "Peaster did not state that he or any other McDonald's employee were being discriminated against because of their race," while Peaster argues that these remarks were "criticisms of McDonald's lack of progress." [Dkt. 176 ¶ 5.] Peaster, however, acknowledged in his comments that he "do[es] like the strategy we have with DEI." [Dkt. 190 ¶ 5.]

After the town hall, Peaster alleges that he "noticed a change as Kempczinski no longer exchanged pleasantries in the hallway and would look past Peaster as if Peaster was not there." [*Id.* ¶ 16.] This, he says, was the beginning of his treatment as "the invisible safety and security officer to the CEO of the company." [*Id.* ¶ 14.] Defendants dispute this characterization and purported change in pleasantries. [*Id.* ¶¶ 11, 14.]

Effective January 2022, Peaster was promoted to Vice President, Global Chief Safety, Security, and Intelligence Officer, and the corporate structure was reorganized so that GSSI reported to the Global Legal Department. [Dkt. 176 ¶ 7.] Chief Legal Officer Desiree Ralls-Morrison was responsible for the decision to promote Peaster and transfer his department. [*Id.*] ███████████████████████████████████████████████████ [*Id.* ¶ 8.] She also emphasized that his

---

contradict them with evidentiary material, and so these are deemed admitted. *See* L.R. 56.1(e)(3). Defendants unhelpfully dispute *nearly every fact* as immaterial, even those that strike at the heart of Peaster's claims. For this reason, the court calls out only genuine *factual* disputes in its summary of the record.

"most important priority is to protect the CEO," and Peaster understood that "he was the primary person at McDonald's responsible for Kempczinski's physical safety and protection." [*Id.* ¶ 9.]

Peaster, however, believes he was prevented from running the department effectively, and argues that the increased responsibility, coupled with what followed, was a "recipe for failure." [Dkt. 190 ¶ 14, 18.] What followed was this:

In July 2022, Peaster attempted to meet with Kempczinski to "discuss ███████████████████████████████████ [*Id.* ¶ 18.] The meeting was rescheduled to August and then canceled, and Peaster met with Ralls-Morrison instead. [Dkt. 176 ¶ 14.]

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [*Id.* ¶¶ 25, 30.] He was unable to do so, though Defendants note that he eventually hired and trained three external contractors to replace ███████. [*Id.* ¶ 34.]

At the time, McDonald's was preparing for a company-wide reorganization. As a result, Ralls-Morrison testified to being "very careful about what positions to backfill and who she could bring on" and was unlikely "to increase any budget at the end of 2022." [Dkt. 176 ¶ 27.] Even so, Peaster was aware from new-hire emails that several positions had been filled. [Dkt. 190 ¶ 26.] For their part, Defendants note that Ralls-Morrison limited hiring to positions she was confident would survive the reorganization, and that she prevented others from filling open roles, too. [Dkt. 176 ¶¶ 29–31, 33.] They also contend that Peaster failed to provide Ralls-Morrison with requested information to inform her ability to evaluate his requests, which Peaster disputes, stating she never asked for the information, and that, in any event, he provided it. [*Id.* ¶¶ 20–21, 32.]

Between August 2022 and October 2022, two security incidents occurred that contributed to Ralls-Morrison "los[ing] confidence in Peaster's ability to effectively lead the lead the Company's global security program and protect McDonald's executives at the level she expected." [*Id.* ¶ 85.] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Peaster disputes Defendants' assessment of fault—both for the incidents and more broadly—arguing that McDonald's "caused the conditions that resulted in the security breaches by preventing Peaster from running GSSI effectively." [*Id.* ¶ 85.]

3

In November 2022, Ralls-Morrison informed Peaster that he was being terminated. [*Id.* ¶ 2; Dkt. 190 ¶ 46.] The decision was Ralls-Morrison's alone to make, ███████████████████████████████████████████████████████████████ Ralls-Morrison testified to terminating Peaster because she lost confidence in his abilities, which Peaster disputes only insomuch as he believes, again, that McDonald's "caused the conditions that resulted in the security breaches by preventing Peaster from running GSSI effectively." [*Id.* ¶ 84.]

On these facts, Peaster sued McDonald's and Kempczinski for violations of 42 U.S.C. § 1981, arguing that he was subject to race discrimination and unlawful retaliation.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The court construes the evidence in the light most favorable to the non-moving party, giving him the benefit of all reasonable inferences. *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

## III. Analysis

### A. Discrimination

Peaster first claims that Defendants discriminated against him on the basis of race, violating § 1981. Though he argues at length that Defendants targeted him, he fails to provide evidence permitting a factfinder to conclude that race was a but-for cause of his termination (or the underlying events).

At summary judgment, the court "look[s] to see 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused the discharge or other adverse employment action.'" *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters.*, Inc., 834 F.3d 760, 765 (7th Cir. 2016) (cleaned up). Peaster may either "prove discrimination in a holistic fashion," or rely on the *McDonnell Douglas* burden-shifting framework, "'which gives the plaintiff the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual.'" *Id.*

4

(quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022). Regardless, he must prove that race was the "but-for cause of the adverse employment decisions." *Saud v. DePaul Univ.*, 2025 WL 2846441, at *2 (7th Cir. Oct. 8, 2025) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

Peaster primarily organizes his claim using the *McDonnell Douglas* framework, so the court begins there. To establish a prima facie case of employment discrimination, he must show that he "(1) belongs to a protected class, (2) met the defendant's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who were not members of his protected class." *Id.* at *3.

Nobody disputes that Peaster, who is Black, belongs to a protected class. Nor does Peaster challenge, factually, that he "failed to meet McDonald's legitimate expectations"—only that the analysis is "inappropriate" when such "expectations are themselves applied in a discriminatory ... way." [Dkt. 174 at 13. (citing *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002).] Core to Peaster's overall argument is his contention that Defendants set him—and him alone—up to fail, causing the conditions that prevented him from performing effectively. [*Id.* at 10; Dkt. 176 ¶¶ 84–85.] The court therefore agrees that "the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably." *Grayson*, 308 F.3d at 818.[3] *See Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 612 n.3 (7th Cir. 2001), *overruled on other grounds by Ortiz*, 834 F.3d 760 (observing that the "second prong … was not necessary to the analysis [when] the people judging [plaintiff's] performance were the same she accused of discriminating against her").

Accordingly, the court considers the two disputed prongs—that Peaster suffered an adverse employment action and was treated less favorably than peers—in turn.

1. **Adverse Employment Action**

Adverse employment actions, which involve "a significant change in employment status," *Reives v. Illinois State Police*, 29 F.4th 887, 894 (7th Cir. 2022) (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)), "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions

---

[3] "The legal analysis for discrimination claims under Title VII and § 1981 is identical," and so Title VII cases like *Grayson* are relevant to Peaster's § 1981 claim. *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015).

5

amounting to constructive discharge." *Id.* (quoting *Barton v. Zimmer*, 662 F.3d 448, 453–54 (7th Cir. 2011)).

There is no dispute that Peaster's termination was an adverse employment action. [Dkt. 139 at 14.] Defendants challenge whether *other* actions Peaster identified were adverse, namely that Kempczinski ignored and refused to meet with Peaster, "instructed Ralls-Morrison to target Peaster's department for budget cuts," and "stonewall[ed] Peaster's requests for additional staff to provide enhanced security." [Dkt. 175 at 13.] These actions, Peaster argues, prevented him from doing his job. [*Id.*] This is important, because the crux of his argument is not that he was *fired* for his race, but that he was "ultimately fired for security incidents that occurred as a result" of being set up to fail. [*Id.* at 2]. In other words, Peaster says that the decision to terminate his employment is necessarily contextualized by Defendants "caus[ing] the conditions that resulted in the security breaches by preventing Peaster from running GSSI effectively."[4] [Dkt. 176 ¶¶ 84–85.]

The Seventh Circuit recognizes that being "'set up' by [defendants] to fail … is a perfectly good theory of discrimination." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 746 (7th Cir. 2002) (discussing allegation that plaintiff was "given tasks that he could not be expected to complete within the prescribed deadlines and then being fired when he failed to make them"). *See also Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (observing that liability attaches when termination is tainted by prejudicial conduct, including that which sets a plaintiff up to fail).[5] Peaster's disparate treatment claim therefore turns on whether Defendants set him up to fail, and whether his race was the but-for cause of their conduct.

The parties dispute whether Peaster was actually set up for failure: Peaster frames his inability to "fill open positions" or "increase the budget to provide [enough] security" as part of a "recipe for failure." [Dkt. 190 ¶ 14.] Defendants say that "the open position created by ▮▮▮▮▮▮▮▮ retirement was replaced by three contractors in 2022," and that others testified they believed staffing was sufficient. [*Id.*] Because

---

[4] Peaster also doesn't attempt to identify colleagues who McDonald's did *not* terminate for engaging in comparable conduct—only white peers he believes were put in more promising positions to succeed. [Dkt. 174 at 17–18.]

[5] Defendants cite *Jones v. Leavitt*, 2005 WL 946885, at *6 (N.D. Ill. Mar. 18, 2005), for the contrary holding that "hiring restrictions and travel budget cuts which were not imposed on other executives did not constitute adverse employment actions." [Dkt. 186 at 22–23.] This misrepresents *Jones*, which instead says that the plaintiff "presents no evidence that the EPA imposed stricter hiring restrictions and budget cuts on her, and Jones' duties, responsibilities, compensation, and benefits did not change as a result of any of the other alleged acts. Therefore, these acts do not constitute adverse employment actions." *Jones*, 2005 WL 946885, at *6. This suggests that imposing hiring restrictions and budget cuts, distinct from the other acts alleged, *would* constitute adverse employment actions if supported by evidence.

6

the adequacy of McDonald's security is a disputed, material question of fact, it cannot be resolved at summary judgment, so the dispositive question becomes Defendants' intent.

### 2. Comparators

"[E]vidence that the employer treated better a similarly situated employee outside the plaintiff's protected class can provide some circumstantial evidence of discrimination." *Lane v. Riverview Hosp.*, 835 F.3d 691, 696 (7th Cir. 2016). Failure to do so can prove fatal, "particularly where the record is devoid of any other discriminatory evidence," as it is here. *Mustafa v. Illinois Prop. Tax Appeal Bd.*, 67 F. Supp. 3d 988, 996 (N.D. Ill. 2014).

To prevail, Peaster "must show the purported comparator was 'directly comparable to [him] in all material respects' so as to 'eliminate other possible explanatory variables.'" *Downing v. Abbott Lab'ys*, 48 F.4th 793, 805 (7th Cir. 2022) (quoting *Williams v. Off. of Chief Judge of Cook Cnty.*, 839 F.3d 617, 626 (7th Cir. 2016)). Relevant considerations include whether the employees held the same job description and supervisor, were subject to the same standards, and "'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them.'" *Id.* (quoting *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018)); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 226 (7th Cir. 2017). The "'proposed comparator need not be identical in every conceivable way, however." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018) (quoting *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013)). The inquiry is a common-sense one, asking, "'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012)). Though this is "'usually a question for the fact-finder,'" summary judgment is appropriate when "'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman*, 667 F.3d at 846–47 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)).

Peaster, who bears the burden "to submit relevant evidence" of comparators, falls short. *Johnson*, 892 F.3d at 895. His Rule 56.1 statement identifies five white colleagues "permitted to replace or backfill open positions." [Dkt. 190 ¶ 26.] ████████████████████████████████████████████, who Peaster's answers to interrogatories characterize as his "peers with McDonald's Legal Department." [Dkt. 177-3 ¶ 10.] But Peaster never elaborates upon this, and so there is nothing in the cited evidence to permit a factfinder to make the necessary comparison.

Beyond his conclusory answer to Defendants' interrogatory, Peaster offers only his own deposition as evidence that his peers were permitted to backfill open roles. [*Id.*; Dkt. 146-3 (Peaster's Dep. Tr. 157:14–160:17).] Absent from the record, though,

7

is any discussion of job titles, responsibilities, or other evidence indicating that the individuals are, in fact, his peers. He merely identifies them as so.

Nor does his testimony permit a jury to find that the purported comparators "engaged in similar conduct without … differentiating or mitigating circumstances." *Downing*, 48 F.4th at 805 (7th Cir. 2022) (quoting *Barbera*, 906 F.3d at 629). Peaster's belief that positions were backfilled relies exclusively on his receipt of emails welcoming new employees, but he does not—and cannot—name the purportedly backfilled roles. [Dkt. 146–3 (Peaster's Dep. Tr. 157:15–163:17).[6]] Indeed, he admits to only *assuming* that they were backfills, and he acknowledges that, having failed to discuss the hiring process with these alleged peers, he knows nothing about the basis or need for them. [*Id.*] His wanting testimony makes meaningful comparison impossible.

Even if his testimony was sufficient, Peaster never grapples with what would be his next task: showing that Defendants' non-discriminatory reason for restricting hiring was pretextual. *See Wince*, 66 F.4th at 1040.

Ralls-Morrison testified that hiring was paused because of an impending restructure, and Defendants provided evidence in the form of an email to senior employees—including four of Peaster's alleged peers—announcing that:

> We are pausing our efforts to fill most open roles and looking at how we can shift work. You might see that there are some roles or promotions that are still happening. If so, they are happening in furtherance of our focus on becoming a more efficient organization.

[Dkt. 146-14.] She also testified that at least one white employee, ███████, was "unable to fill a number of positions in the groups for which she was responsible." [Dkt. 176 ¶ 33.] Peaster "disputes" these justifications but provides no supporting evidence apart from his own testimony, which has zero non-speculative bases beyond the welcome emails. [*Id.* ¶ 27–33.] *See Whitlock v. Brown*, 596 F.3d 406, 411–12 (7th Cir. 2010) (holding that, at summary judgment, "sufficiency of a 'self-serving' statement depends on whether the statement is based on personal knowledge and whether it is grounded in observation as opposed to mere speculation"). The emails themselves do not undermine Defendants' position, and so Peaster fails to demonstrate pretext, too.[7]

---

[6] To capture the full, relevant conversation, this excerpt extends slightly beyond that to which Peaster cites in his Rule 56.1 statement.

[7] Indeed, Peaster testified to understanding that hiring was restricted due to the reorganization and budget constraints. [Dkt. 146-3 (Peaster's Dep. Tr. 152:2–18).] He harps on a five-month difference between when he first sought to backfill a position (June) and when he learned of the reorganization (October). [*Id.*] But he also admits that leadership's

8

To be sure, while Peaster devotes considerable time to discussing pretext in other contexts, his inability to backfill is the *only* one for which he even attempts to identify comparators. Having failed to successfully do so, he cannot establish a prima facie case of employment discrimination.

### 3. Holistic Approach

Peaster may also "prove discrimination in a holistic fashion, by proffering direct or circumstantial evidence of intentional racial discrimination." *Wince*, 66 F.4th at 1040. The question, then, is "[w]hether a reasonable juror could conclude that [Peaster] would have kept his job"—or otherwise avoided an adverse employment action—"if he had a different ethnicity, and everything else had remained the same." *Ortiz*, 834 F.3d at 764.

Nothing changes under this approach. Beyond alleging that white peers were permitted to make new hires, Peaster points to no evidence suggesting that any action taken toward him was motivated by *his* race. The closest he comes is arguing that, according to testimony from employee █████, "Kempczinski was reluctant" to fire ████████████, who is Black, "in too close of proximity to Peaster's termination ████████████████████████████████████████ [Dkt. 190 ¶ 48 ██████████████████████████████████ According to Peaster, "clearly, race, and not the best security," was therefore on Kempczinski's mind. [Dkt. 174 at 14.]

Any notion that Kempczinski's reluctance to fire ██████ was racially motivated is, at best, speculation. █████ testimony does not support the inference that race was a consideration; his testimony was only that Kempczinski wanted to hold off on a decision about █████ until after the "Peaster thing is taken care of." █████ ████████████████████ testified that he could not say what Kempczinski meant by the comment, and Peaster points to no other evidence suggesting a racial motivation. [*Id.*] That race was the reason is an inference that "veers too far into speculation [and fails] to survive summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) (citing *Jones v. Van Lanen*, 27 F.4th 1280, 1286 (7th Cir. 2022). Moreover, there's a meaningful difference between acknowledging an employee's race and discriminating against them for it. Peaster himself doesn't even argue that █████ retention is proof of the latter—only the former.

As to race, the record is otherwise barren. That, of course, doesn't mean Peaster failed to argue that he was *targeted*—only that race, as opposed to personal animus, wasn't the but-for cause. To that end, Peaster has painted a picture with at least a few eyebrow-raising components: ████████████████████████████████

---

planning for the reorganization began in March, thereby preceding his requests. [Dkt. 176 ¶ 19.]

9

███████████████, and allegations of a serial cold shoulder.[8] But, unless the underlying motivation was Peaster's race, these are arguments for retaliation, not discrimination. And Peaster himself makes explicit—when concluding his brief's section on discrimination—that he believes "Kempczinski was determined to punish [him] *for his Town Hall statements*, and Ralls-Morrison carried out her boss's wishes." [Dkt. 174 at 20 (emphasis added).]

Regardless of the court's approach, Peaster's claim of disparate treatment based on race cannot survive summary judgment.

### B. Retaliation

Peaster also alleges that Defendants retaliated against him for speaking "candidly at the November 2021 Town Hall about McDonald's failure to advance racial equity during his 30-plus years with the company." [Dkt. 174–21.] To prevail on his retaliation claim, Peaster must prove "(1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action." *Clacks v. Kwik Trip, Inc.*, 108 F.4th 950, 958 (7th Cir. 2024). He fails on the first element.

"Protected activity is some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (internal quotations and citation omitted) (discussing parallel Title VII). The opposed practice need not be "*actually* [be] prohibited" so long as the employee has a "'good-faith and *reasonable* belief that he is opposing unlawful conduct.'" *Id.* (emphasis in original) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011)). But an employee's mere "efforts to raise awareness of racial issues," however, are insufficient when they do not address an employment practice. *Id.* at 497, 501 (holding that school principal did not engage in protected activity when "urg[ing] the teachers to be proactive about addressing racial issues with their students," because her comments "focused almost entirely on behavior by the students and did not concern any employment practice by the school district").[9]

---

[8] Defendants argue that the emails, where Ralls-Morrison quotes Kempczinski, and where a separate legal officer quotes Ralls-Morrison, are inadmissible hearsay. But McDonald's and Kempczinski are defendants, and statements offered against the opposing party—either by the party itself or "by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay. Fed. R. Evid. 801.

[9] Section 1981, as compared to Title VII, prohibits retaliation "for opposition to substantively-barred discrimination" beyond employment itself, such as discrimination against customers and prospective customers. *Klinger v. BIA, Inc.*, 2011 WL 4945021, at *2 (N.D. Ill. Oct. 18, 2011). Here, this is a distinction without difference, since the only alleged *discrimination* concerns pay equality and equal opportunities for people of color. [Dkt. 176 ¶ 5.]

10

Peaster argues that his candid remarks at the Town Hall constitute a protected activity because his "statements were aimed at addressing racial inequality in the workplace." [Dkt. 174 at 21.] Specifically, he contends that he "accused McDonald's – through Kempczinski's conduct – of tak[ing] a step back, another criticism of McDonald's [approach to] race in the workplace." [*Id.*] The record, however, doesn't support his framing.

Kempczinski convened the town hall to address and apologize for his controversial texts to Mayor Lightfoot. There, Peaster said the following:

> Hey, I've shared a lot of thoughts over the last couple of days, but I just felt compelled to comment on the question of what should employees who agree with the comment think about. You said that there are over -- which you are right, over 300 kids that's been killed in the Chicago and area, so I would suggest that we think about empathy when we think about that, because a lot of these kids -- all of these kids probably came from very good homes, parents trying to do the best they can for them and they are victim of circumstances. And the second thing I would say is that there are a lot of employees -- you have employees working in this building that was raised in these neighborhoods that made it out and so when things like this happen, you know, there's so many emotions that go through, because we know what our parents did to try to make sure we were safe and have a better opportunity than they had. So a lot of sacrifice that goes on there. I shared this morning the other thing that we have to keep in mind is outside of McDonald's there's so much going on when it comes to people of color or black people, voter right suppression, you know. This big drive to not want to teach history, all of history, not just a segregated piece. All of this, you know, we wake up in the morning with this on our minds and we try to come bring our best self to work and so it's a lot of things that you know if you're not walking in my skin, you don't have to think about that we have to come to work and especially those of us who are people leaders, we try to lead our diverse groups without showing these types of emotions. I had made a comment about -- you know we talk about bringing ourself to work and (inaudible) bring yourself to work, I don't think that would ever happen for me as a black man. It's unfortunate. I do like the strategy we have with DEI. I think we've been there before. I shared a comment I had with a young man in the UK, black man, and he said Michael I can't imagine what you went through in 1987 and I said we're talking about pay equality today, right. He said yeah. I said we're talking about you know equal opportunities for people of color and women today. Yeah. I said we were talking about the same things in 1987. And so for me the north star is get to a point where irregardless of who leadership is, you know we're always keep our eye and our foot on DEI to make sure we never go backwards like we have again.[10]

---

[10] Kempczinski's nonverbal interjections ("mm hm") are omitted.

11

[Dkt. 190 ¶ 5.] Peaster's statement wasn't about McDonald's employment practices or workplace discrimination. Instead, he addressed comments that Kempczinski made *outside* the workplace, which were neither *about* nor *directed* at employees. To the extent Peaster discussed the effect of those texts on employee morale, there was no allegation that Kempczinski or McDonald's had engaged in discriminatory or unlawful behavior. Indeed, the throughline of Peaster's remarks—and the context of surrounding incident—was societal racial injustice, i.e. what occurs "outside of McDonald's." [Dkt. 190 ¶ 5]. When he did directly mention McDonald's, he was complimentary. [*Id.* ("I do like the strategy we have with DEI").]

Peaster now asserts that references to "pay equality and equal opportunities for people of color" were direct criticisms of McDonald's. [Dkt. 176 ¶ 5 (cleaned up).] While "an informal complaint may constitute protected activity" under § 1981, "[v]ague and obscure 'complaints' do not." *Davis v. Time Warner Cable of Se. Wisconsin*, L.P., 651 F.3d 664, 674 (7th Cir. 2011) (internal quotations and citation omitted); *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). And here, the "criticisms" were too vague to be reasonably construed as a complaint: they never mentioned McDonald's (and were shared amid broader commentary on race), nor did they allege that anyone at the company was subject to unlawful discrimination—only that people are still "talking about" those issues today. [Dkt. 190 ¶ 5]. The notion that Peaster intended to lodge a complaint about McDonald's employment practices is also inconsistent with his unambiguous endorsement of its diversity, equity, and inclusion strategy. *Id.*

Put differently, the comments were not "sufficiently specific," such that Kempczinski would have been aware Peaster was complaining about an employment practice. *See Watts v. SBC Servs., Inc.*, 2006 WL 2224054, at *8 (N.D. Ill. July 31, 2006) (citing *Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 814–15 (7th Cir. 2011) (granting judgment against plaintiff when he never "set forth tangible evidence that indicates [employer] knew he was participating in a complaint that concerned illegal discrimination"). When deposed, Kempczinski stated that he understood Peaster as "trying to convey how my comments would be construed or could be construed by people who have lived in some of those challenged areas." [Dkt. 146–1 (Kempczinski's Dep. Tr. 14:22–15:1).] Peaster, meanwhile, confirmed that he spoke because he didn't believe Kempczinski "understood what he had said and how it affected people, not only in our office, but people outside the office, our customers." [Dkt. 146–3 (Peaster's Dep. Tr. 101:5–19).] On these facts, Peaster's argument that he was opposing *discrimination*, rather than raising awareness of racial issues, falls flat.

This does not mean that the record is devoid of facts suggesting Peaster was targeted. But because his remarks at the town hall do not constitute protected activity, § 1981 provides no remedy. *See Durkin,* 341 F.3d at 614–15 ("axiomatic that

a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity").

## IV. Conclusion

Because Peaster cannot show that Defendants targeted him for his race or participation in a protected activity, they are entitled to judgment as a matter of law. The motions for summary judgment are both granted, and the motions to bar witness testimony are denied as moot.

Enter: 22-cv-7037
Date:  October 24, 2025

_____
Lindsay C. Jenkins